UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALICIA ANN WILLIAMS,                                No. 14-14101

        Plaintiff,                                District Judge Nancy G. Edmunds

v.                                                  Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff Alicia Ann Williams brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Supplemental Security Income ("SSI") under the Social Security Act. The parties have filed cross motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's motion [Doc. #20] be GRANTED and that Plaintiff's motion [Doc. #16] be DENIED.

**I.   PROCEDURAL HISTORY**

On November 7, 2011, Plaintiff filed an application for SSI benefits, alleging disability as of April 11, 1984. Following initial denial of the claim, the Plaintiff requested a hearing, which was conducted on May 8, 2013 before Administrative Law Judge ("ALJ") J. Thomas McGovern (Tr. 72-96). The Plaintiff, represented by attorney Peter E. Bec, testified, as did Vocational Expert ("VE") Don K. Harrison. On June 27, 2013, the ALJ found Plaintiff not disabled within the meaning of the Social Security Act (Tr. 56-67). On August 27, 2014, the Appeals Council denied review (Tr. 1-4). The

-1-

Plaintiff filed for judicial review of the Commissioner's final decision on October 24, 2014.

## II.   FACTS

The Plaintiff, born April 11, 1984, was 29 years old at the time of the administrative hearing (Tr. 173). She completed 11th grade (Tr. 217). She had no prior earnings (Tr. 182). She alleges disability resulting from a speech impairment, brain tumors, seizures, kidney stones, lupus, fractured hip/tail bone, Attention Deficit Disorder ("ADD"), depression/bipolar disorder, and anxiety (Tr. 216).

### A.  Plaintiff's Testimony

At the May 8, 2013 hearing, the Plaintiff testified as follows:

The Plaintiff lived with her brother (Tr. 77). Her current income was limited to food stamps (Tr. 77). She had not worked since 1998 but had been looking for work since (Tr. 78). She experienced problems sitting and walking due to a fractured hip (Tr. 78). She was unable to sit for more than two-and-a-half hours at one time (Tr. 78). She coped by back pain caused by prolonged sitting by lying on a hard surface, ice packs, and physical therapy (Tr. 79). She attributed her back pain to kidney stones (Tr. 79). She had not yet followed through an a recommendation to see an orthopedic surgeon (Tr. 80).

The Plaintiff experienced ongoing depression and was currently seeing a therapist twice a week (Tr. 80). Symptoms of depression included frequent crying jags (Tr. 81-82). She looked for jobs by applying online (Tr. 82). Her online activity included "social media" which she was able to access through her cell phone (Tr. 82-83). She currently took Pamelor for depression and Xanax (on an as-needed basis) for anxiety (Tr. 83). She experienced daily panic attacks characterized by shortness of breath and the desire to

"isolate" herself (Tr. 84). The panic attacks lasted between 10 minutes and two to three hours (Tr. 84). Her ability to work was also affected by the condition of Attention Deficit Hyperactivity Disorder ("ADHD") for which she took Ritalin (Tr. 85). Symptoms of ADHD included poor organizational skills and distraction (Tr. 86).

The Plaintiff was independent in personal care and dressing tasks, but did not perform any household chores besides picking up after herself and preparing simple meals (Tr. 86-87). She read "self-help" books recommended by her counselors and enjoyed playing online games with her 13-year-old daughter (Tr. 87). Her daughter lived with the Plaintiff's parents but the Plaintiff typically spent three to four hours with her every day (Tr. 88). The Plaintiff belonged to the PTA but did not attend school activities (Tr. 88). The Plaintiff had a valid driver's license and was able to drive, but did not have a car (Tr. 88-89). She shopped for groceries with the help of a family member due to "the whole atmosphere" at a grocery store (Tr. 89). The Plaintiff's physical condition had not been "the same" since she fell off a bungalow roof in 2006 (Tr. 90).

### B. The Medical Records

### 1. The Treating Records[1]

June, 2007 psychological intake records note a GAF of 45[2] due to bipolar disorder (Tr. 342-346). April, 2008 psychological intake notes state a diagnosis of bipolar disorder (Tr. 277). August, 2008 records state that she was not compliant with directions for psychotropic medication (Tr. 375). An October, 2008 medication review states that

---

[1]Records pertaining to conditions unrelated to the disability claim have been reviewed in full but are omitted from the current discussion.

[2]A GAF score of 41 to 50 indicates '[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning,' such as inability to keep a job. *Diagnostic and Statistical Manual of Mental Disorders—Text Revision* ("*DSM–IV–TR*"), 34 (4th ed. 2000).

her current medications were not helpful (Tr. 338). November, 2008 records state that her psychological condition had stabilized (Tr. 273). In April, 2009, the Plaintiff reported an improvement in mood swings but noted that she experienced "extreme anxiety" (Tr. 272, 337). A November, 2009 EEG taken in response to the Plaintiff's report of "spells" was unremarkable (Tr. 318). A physical examination showed full strength in all extremities (Tr. 305).

January, 2010 treating records note a diagnosis of sinus problems (Tr. 296). A February, 2010 CT of the abdomen and pelvis showed a kidney stone (Tr. 320). June, 2010 treating notes state that "copious salt intake" was recommended for Plaintiff's report of dizziness (Tr. 283). In September, 2010, the Plaintiff claimed that she was unable to take psychotropic medication "due to Lupus" (Tr. 334). She appeared well-groomed with appropriate behavior and good short-term and long-term memory (Tr. 332). She was assigned a GAF of 55[3] (Tr. 334). October, 2010 treating records note a normal gait and station (Tr. 279). A December, 2010 MRI of the brain taken in response to the Plaintiff's report of headaches was unremarkable (Tr. 322).

In January, 2011, the Plaintiff quit therapy because she was "dissatisfied with [her] therapist" (Tr. 329). The same month, an echogram of the kidneys showed a possible lipoma on the left kidney but otherwise unremarkable results (Tr. 347). Also in January, 2011, J. Shavell, D.O. noted the Plaintiff's report of seizures and "possible collagen disease" (Tr. 354). He noted that the Plaintiff's report of "sharp, shooting pains in her arms" were "not terribly convincing" (Tr. 354). He noted that the physical examination was otherwise normal (Tr. 354). The same month, Julia Bemer, M.D. noted the

---

[3] A GAF score of 51 to 60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning. *DSM–IV–TR* at 34.

Plaintiff's report of back pain radiating into the lower extremities (Tr. 416-417). A physical examination was "unremarkable" (Tr. 416). Dr. Bemer noted "no unusual anxiety or evidence of depression (Tr. 417). She advised the Plaintiff to Motrin as needed (Tr. 417).

In April, 2011 Richard Grucz, M.D. noted the Plaintiff's report of intermittent back pain (Tr. 418-419). His physical examination was negative for abnormalities (Tr. 419). The Plaintiff failed to show up for an April, 2011 neurology appointment (Tr. 360). Dr. Grucz's July, 2011 records note Plaintiff's denial of radiating pain (Tr. 420).

Also in July, 2011, the Plaintiff began physical therapy (Tr. 391). Plaintiff reported that she was responsible for cooking, laundry, cleaning, and shopping chores (Tr. 393). She reported that her activities included "running, jogging, cardio, yoga, stretches, [and] meditation" (Tr. 393). She reported exercising three to four times a week (Tr. 393). She reported that she was prevented from sitting for more than one hour but could walk "any distance" (Tr. 397). Her rehabilitation potential was deemed excellent (Tr. 402). The following week, Plaintiff reported increased pain and less flexibility (Tr. 404). In August, 2011, Plaintiff sought emergency treatment for an STD, reporting that it had "probably . . . turned into pelvic inflammatory disease" (Tr. 366-367). She was referred for an outpatient pelvic exam (Tr. 371). Dr. Grucz's records state that Plaintiff reported level "2" back pain on a scale of 1 to 10 (Tr. 422). The following month, a kidney stone was fragmented by shockwave lithotripsy (Tr. 379, 388). Physical therapy discharge records note a reduction in pain (Tr. 407-409). Plaintiff reported difficulty sitting for more than four to six hours at a time (Tr. 409).

October, 2011 treating records note the Plaintiff's report of continuing headaches (Tr. 357-358, 424-425).

A January, 2012 "biopsychosocial assessment" noted the Plaintiff's report that she had been in an abusive relationship and had been obliged to file police reports (Tr. 439). She reported "chronic health issues including epileptic seizures" (Tr. 439). Assessment records note "pressured speech and some stuttering" (Tr. 443). The Plaintiff reported that she was being supported by her mother (Tr. 448). She reported that she did "various volunteer work" including "advertisement and daycare" (Tr. 448). Psychiatric treating records from the following month note the Plaintiff's claims of seizures, lupus, and a brain tumor (Tr. 483). She was assigned a GAF of 48 (Tr. 485). August, 2012 therapy records note the Plaintiff's report of depression and anxiety (Tr. 532). The Plaintiff was encouraged to "think about supported employment to start" (Tr. 604). Later the same month, the Plaintiff reported that she and her daughter had been cleaning after a fire at their residence (Tr. 597, 599). She reported that she wanted to "get some errands done" and have "some social time/shopping time" (Tr. 597). Her therapist noted "significant speech issues/stuttering" and had a "difficult time trusting others" (Tr. 597).

In September, 2012, Carlos Godoy, M.D. found that due to a "somatic dysfunction" of the pelvis and back, the Plaintiff was "medically unable to use public transportation" (Tr. 433). November, 2012 psychiatric and counseling records note an improved affect (Tr. 464, 569). In December, 2012, the Plaintiff reported a break-in by a former boyfriend, but noted that she felt "okay" and that her psychological condition had "stabilized" with therapy (Tr. 643).

February, 2013 therapy notes state that the Plaintiff's mental status was "improving" (Tr. 634). Therapy notes from later the same month state that the Plaintiff requested a new psychiatrist after she was refused ADHD medication because she was not in school (Tr. 622). A March, 2013 medication review noted only "mild" anxiety and

"mild" memory and language problems (Tr. 451). The following month, the Plaintiff reported good results from a medication change (Tr. 453).

## 2. The Non-Treating Records

On December 10, 2006, R. Hasan, M.D. performed a consultive psychological examination on behalf of the SSA, noting the Plaintiff's report of lifelong behavioral problems including suicidal ideation, mood swings, and sleep disturbances (Tr. 267). Dr. Hasan noted that the Plaintiff had a seven-year-old daughter but had "never held a stable job" (Tr. 268). He noted that Plaintiff denied legal problems (Tr. 268).

Dr. Hasan observed "short term memory problems" but that the Plaintiff was able to take care of her personal needs (Tr. 268). He observed that the Plaintiff "stuttere[d] a lot," noting her report of a speech impairment since childhood (Tr. 268). Dr. Hasan found the presence of "bipolar, ADHD, speech impairment, stuttering, [and] learning disability" (Tr. 270). He assigned the Plaintiff a GAF of 50 to 55 and found that she could manage her benefit funds (Tr. 270).

In February, 2012, Atul C. Shah, M.D. performed a consultative psychiatric examination of the Plaintiff on behalf of the SSA, noting the Plaintiff's stutter (Tr. 427). The Plaintiff reported anxiety attacks (Tr. 427) Dr. Shah observed that the Plaintiff had "a snappy and frustrated mood and gets angry and upset very easily but no mood swings appreciated" (Tr. 427). He noted the Plaintiff's report that she had applied for benefits twice before the current application (Tr. 428). He noted the Plaintiff's report that she did "nothing" but stay in bed, "make small meals," and watched television (Tr. 428). Dr. Shah found that the Plaintiff had "moderate functional impairment of occupational activity" due to depression, a panic disorder, and ADHD which would interfere with the ability to interact with coworkers or the public (Tr. 429). He assigned her a GAF of 60

(Tr. 429). Later the same month, Chokkanathapuram V. Krishnamoorthy, M.D., performed a non-examining review of the treating and consultative records on behalf of the SSA, finding that Plaintiff had mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 118).

### 3. Records Submitted After the June 27, 2013 Administrative Decision

An August, 1998 discharge summary by Aurora Healthcare state that the Plaintiff, 14, was admitted for psychiatric hospitalization after throwing furniture around the house and stating that she wanted to kill herself after her breakup with a boyfriend (Tr. 646). Treating notes state that the Plaintiff's mother received disability benefits (Tr. 647, 651). Plaintiff's actions were deemed "situational reaction" to the fight with her boyfriend (Tr. 652). She was placed on a suicide watch (Tr. 648, 650). She was discharged against medical advice by her mother (Tr. 648).

In September, 2012, Shlomo Mandel, M.D. examined the Plaintiff in response to her report of back pain since a 2006 accident (Tr. 658). Dr. Mandel noted that a physical examination and imaging studies were unremarkable (Tr. 656-660). He recommended physical therapy (Tr. 658). In December, 2012, Dr. Mandel renewed his recommendation for physical therapy (Tr. 663). May, 2013 therapy notes state that the Plaintiff had been denied SSI six times in the past (Tr. 686). June 10, 2013 therapy notes state that Plaintiff contemplating getting a job (Tr. 674). A June 27, 2013 medication review states that the Plaintiff had "moderate" speech problems, but only mild anxiety (Tr. 665).

On October 14, 2013, Dr. Godoy stated that the Plaintiff was unable to work due to ADD, anxiety, chronic back pain, a speech impairment, and a pelvic fracture (Tr. 691).

## C. The Vocational Testimony

The ALJ asked VE Harrison to assume a hypothetical individual of Plaintiff's age, education, and lack of work experience with the ability to perform exertionally light[4] work with the following limitations:

> [S]it for two hours, stand for six hours but would require the ability to sit and stand at will The individual could perform postural activities occasionally but there would be no climbing of ropes, ladders, scaffolding, [etc]. The individual should not work around unprotected heights or open hazards, or the individual would be limited to simple, unskilled work activities.  these would be work activities in a low stress work environment meaning non-production.  Only occasional work decisions.  And minimal changes in work settings with limited contact with the general public and also limited contact with co-employees being only brief and superficial with them.  With that, would there be jobs at the [exertionally] light level . . .?

(Tr. 92-93).

The VE responded that the individual could perform the light, unskilled work of a hand packer  (1,200 jobs in the regional economy) and linen sorter (1,200) (Tr. 93).  The VE stated that if the above-described individual were off task for 80 percent of the workday, or, were required to miss up to two days of work each month due to her impairments, all work would be precluded (Tr. 94).  The VE finished by stating that his testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") except for his findings regarding the sit/stand option which was based on his own professional experience (Tr. 94).

---

[4] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

### D. The ALJ's Decision

ALJ McGovern found that the Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability date of November 7, 2011 (Tr. 58). The ALJ found next that the Plaintiff experienced the severe impairments of "chronic headaches, somatic dysfunction of the pelvis, low back pain, bipolar disorder, major depressive disorder, [ADHD] [and] marijuana abuse, but that none of the impairments met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 58). The ALJ found that the condition of nephrolithiasis was non-severe (Tr. 58). The ALJ found that the Plaintiff experienced moderate limitation in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 59).

The ALJ determined that the Plaintiff had the Residual Functional Capacity ("RFC") for exertionally light work with the following additional limitations:

> The claimant can stand and/or walk (with normal breaks) for a total of 2 hours in an 8-hour workday; the claimant requires a sit/stand option at the workstation while remaining at the workstation (option means that the individual can sit/stand at will while performing their assigned duties); never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs; and can occasionally climb, balance, stoop, crouch, kneel, and crawl; should avoid unprotected heights and open hazards, work is limited to simple, routine and repetitive tasks employed in a low stress job, defined as having only occasional decision making required and only occasional changes in the work setting; the claimant should have limited contact with the public and coworkers (Tr. 60).

Citing the VE's testimony the ALJ found that the Plaintiff could perform the jobs of electrical accessories assembler, hand packer, or linen sorter (Tr. 66, 93). The ALJ found that while the Plaintiff alleged disability as of the day of her birth, the proper period of consideration was November 7, 2011 through June 27, 2013 (Tr. 56).

The ALJ rejected the Plaintiff's allegations of mental and physical limitation. He cited June, 2010 treating records stating that the Plaintiff "vehemently" denied symptoms

-10-

of depression (Tr. 61). The ALJ observed that January, 2011 therapy discharge records note moderate psychological symptoms (Tr. 62). He cited Dr. Gruez's August, 2011 and October, 2011 records stating that the back condition was improving (Tr. 62). The ALJ noted that the Plaintiff's treatment for the back condition was relieved by "exercise, massage, movement, and physical therapy" (Tr. 62). The ALJ observed that the claims of physical limitation were also undermined by the Plaintiff's failure to follow through with specialized treatment (Tr. 62-63).

The ALJ adopted Dr. Shah's February, 2012 consultative finding that the Plaintiff experienced moderate psychological symptoms but rejected his findings to the extent that they pertained to the Plaintiff's vocational limitations (Tr. 63). The ALJ noted that the Plaintiff failed to show up to numerous scheduled therapy sessions in 2012 and 2013 and reported in April, 2013 that she felt "very good" and that therapy had changed her life for the better (Tr. 64).

### III. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.     FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.     ANALYSIS

At the outset, I note that the Plaintiff is unrepresented by counsel.  Accordingly, her *pro se* motion for summary judgment will not be held to the standard of a practicing attorney, but will be given a liberal construction.  *See Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004), citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Herron v. Harrison*, 203 F.3d

410, 414 (6th Cir. 2000) (*pro se* pleadings are held to "an especially liberal standard"); Fed.R.Civ.P. 8(e) ("Pleadings must be construed so as to do justice"). That said, the Plaintiff's motion for summary judgment, written largely in narrative form, may be fairly read to encompass the following arguments: (1) the ALJ omitted severe impairments at Step Two; (2) the ALJ erred in finding that the Plaintiff's conditions did not meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1; (3) the ALJ's finding of non-disability was not supported by substantial evidence; and (4) the Plaintiff is entitled to a remand under Sentence Six of 42 U.S.C. § 405(g).

### A.    Step Two-Severe Impairments

At Step Two, the ALJ found all of the Plaintiff's claimed impairments "severe" except for kidney stones (nephrolithiasis), which he explicitly found non-severe, brain tumors, lupus, and speech impairment.

"[T]he second stage severity inquiry, properly interpreted, serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims." *Farris v. Secretary of HHS*, 773 F.2d 85, 89 (6th Cir. 1985). An impairment can be considered "not severe . . . only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.'" *Id.,* 773 F.2d at 90 (*citing Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984)). 20 CFR § 416.921(a) defines a non-severe impairment as one that does not "significantly limit [the] physical or mental ability to do basic work activities." The same regulation defines "basic work activities" as "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work  setting." *Id.*

First, there is nothing in the medical records showing that the Plaintiff was ever diagnosed with or treated for lupus, a chronic autoimmune disease, much less that the condition significantly limited her ability to do basic work activities. Likewise, there is no evidence that Plaintiff suffered from a "brain tumor," as that condition is generally and clinically understood. A December, 2010 MRI of the brain was unremarkable (Tr. 322). Notes from Plaintiff's neurological examination state, "Attention and concentration are good. Speech is fluent with no dysarthria and no aphasia. Recent and remote memory function is intact." (Tr. 284). Neither the MRI nor an EEG proved "any clinical explanation" for her claimed presyncopal episodes (Tr. 297). Plaintiff was diagnosed with a *non-symptomatic* pineal cyst, and was referred to an ear-nose-and-throat specialist (Tr. 283-84, 297). There is no evidence that the pineal cyst resulted in any work-preclusive limitations. The ALJ did not err in omitting lupus or "brain tumor" at Step Two.

In terms of a speech impediment, there are indications in the record that at times, Plaintiff presented with "pressured speech and some stuttering" (Tr. 443), and that at a consultative psychological exam she "stutter[ed] a lot" (Tr. 270). On the other hand, treating notes from June of 2010 indicate that Plaintiff's "[s]peech is fluent with no dysarthria and no aphasia" (Tr. 284). In any event, apart from the intermittent observations that the Plaintiff stuttered, there is no evidence that she had any significant work-related limitations as a result.[5]

Finally, the ALJ committed no error in finding that the Plaintiff's previous condition of kidney stones was non-severe. The Plaintiff underwent shockwave lithotripsy for a left

---

[5] Moreover, the limitations that the ALJ established in the RFC–low stress job, limited contact with the public and coworkers–would reasonably account for the Plaintiff's occasional stuttering or measured speech, conditions that would have no significant effect on the ALJ's job findings of electrical accessories assembler, hand packer, or linen sorter.

renal stone on September 19, 2011, with excellent results and no complications (Tr. 379). The medical records contain no subsequent reference to any problem with kidney stones.

## B. Step Three–Listings

At page 4 of her motion, the Plaintiff sets forth a number of Listings, which she characterizes as "legal definitions that support the case." The Plaintiff has the burden at Step Three of proving that she meets a Listing. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

First, the ALJ specifically considered Listings 1.00 (musculoskeletal systems); 11.00 (neurological disorders); and 12.00 (mental disorders). The ALJ cited the findings of Dr. Flores and Dr. Krishnamoorthy (the consultative physicians) that the Plaintiff's conditions did not meet any listings (Tr. 58). In terms of the Plaintiff's claimed mental impairments, the ALJ considered the criteria of Listings 12.04 and 12.09. Noting that a mental impairment must result in at least two *marked* restrictions in the areas of activities of daily living, maintaining social functioning, maintaining concentration, persistence, or pace, or repeated episodes of decompensation, of extended duration, the ALJ undertook a detailed discussion of each sphere. He thoroughly described the record evidence showing that at most, the Plaintiff had *moderate* difficulties in these areas, and that she had experienced no repeated episodes of decompensation, each of extended duration (Tr. 58-60).

Nor do Plaintiff's alleged conditions meet or equal the severity of the other Listings that the Plaintiff sets forth in her brief. As discussed above, there is no evidence that she suffers from or has any limitations as a result of lupus or brain tumors. Her "speech impairment" (stuttering) is non-severe at Step Two, and consequently neither meets nor equals any Listing at Step Three. The record is bereft of any significant objective evidence

that Plaintiff suffers limitations as the result of a current fracture (Listing 1.06)[6] or digestive disorders (Listing 5.01).

In short, the ALJ's findings and conclusions that the Plaintiff was not entitled to a finding of disability at Step Three were well within the standard of substantial evidence.

### C.  Substantial Evidence

"To meet the burden of showing that [Plaintiff] could perform work that is available in the national economy, the Commissioner must make a finding 'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Howard v. Commissioner of Social Security,* 276 F.3d 235, 238 (6th Cir. 2002)(citations omitted). Considering Plaintiff's RFC, age, education, lack of past work experience, and the testimony of the VE, the ALJ found that Plaintiff had the ability to perform other work in the economy, specifically electrical assembly, hand packer, and sorting or inspecting jobs, such as linens. The RFC was reasonably restrictive–including a sit/stand option, a limitation of simple, routine tasks in a low-stress job, and limited contact with the public and coworkers–and was based on a detailed review of the objective medical evidence and fair consideration of the Plaintiff's objectively substantiated impairments (Tr. 60-65). *See Statement of Facts, supra*.

I appreciate that the Plaintiff disagrees with the ALJ's conclusions. However, this Court's review under the "substantial evidence" standard is highly deferential, and it is not our function to re-weigh the evidence or make our own, independent (de novo) disability determination.  Furthermore, the Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In this case, both the RFC and the

---

[6] In her motion, the Plaintiff notes only TMJ of the jaw and a previous hip fracture at age 22.  *Plaintiff's Brief*, p.4.

ALJ's ultimate non-disability decision are supported by substantial evidence.

### D. Sentence Six Material

Based on the record, the Plaintiff's argument for a remand can be construed to reference the evidence submitted after the ALJ's June 27, 2013 administrative opinion (Tr. 644-692).[7]

Under the sixth sentence of 42 U.S.C. § 405(g), records submitted after the administrative decision are subject to a narrow review by the reviewing court. The reviewing court cannot grant summary judgment based on the new material, but if warranted, remands for further review. *Melkonyan v. Sullivan,* 501 U.S. 89, 97–99, 111 S.Ct. 2157, 2163, 115 L.Ed.2d 78 (1991). The court retains jurisdiction in a Sentence Six remand, and enters final judgment only "after post-remand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer,* 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). To establish grounds for a Sentence Six remand, the claimant must show that the "new evidence is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ... " § 405(g); *see Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir.1993).

Assuming that the Plaintiff could show "good cause" for the tardy submission, she cannot show that the newer evidence is "material." To show that the newer evidence is material, the claimant "must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Secretary of Health & Human Services,* 865 F.2d 709, 711 (6th Cir.1988). The 1998 records stating that the Plaintiff threatened suicide after a fight

---

[7] A number of other records documenting the Plaintiff's treatment after the administrative opinion were not made part of the administrative record (Tr. 9-49). While they have been reviewed in full, they are omitted from the present discussion.

with her boyfriend at the age of 14 (deemed a "situational reaction" by a treater) does not shed light on her psychological condition as of the November, 2011 SSI application date (Tr. 56, 67, 173, 646-650). While Dr. Mandel's September and December, 2012 treating records were created within the relevant period, they reinforce, rather than undermine the ALJ's finding that the Plaintiff could perform exertionally light work (Tr. 656-663). Likewise, May and June, 2013 therapy records stating that Plaintiff contemplated getting a job and obtained good results from psychotropic medication would not be likely to change the ALJ's decision (Tr. 665-686).

For differing reasons, Dr. Godoy's October 14, 2013 disability opinion (Tr. 691) does not provide grounds for remand. The opinion post-dates the administrative opinion by almost four months. Dr. Godoy's opinion cannot be construed to state that the Plaintiff was disabled on or before the June 27, 2013. Where a claimant's condition has worsened since the administrative decision, the proper remedy is to initiate a new claim for benefits rather than seek a Sentence Six remand *See Sizemore v. Sec'y of Health & Human Servs.*, 825 F.2d 709, 712 (6th Cir. 1988).[8]

In recommending that the Commissioner's denial of benefits be affirmed, I am not suggesting that the Plaintiff has no limitations, and it is certainly not my intent to trivialize her documented medical problems. However, the ALJ's determination that the Plaintiff is not disabled from all gainful employment is within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

---

[8] Even assuming that Dr. Godoy's opinion were construed to refer to the Plaintiff's condition on or before June 27, 2013, Plaintiff cannot show good cause for failing to submit it before the administrative decision.

## VI. CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #20] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #16] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: March 8, 2016

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on March 8, 2016, electronically and/or by U.S. mail.

                                        s/Carolyn M. Ciesla
                                        Case Manager to the
                                        Honorable R. Steven Whalen